UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DAMIAN R. TRAPANI,

                          Plaintiff,

        -against-

~~ANTHONY J. ANNUCCI, Acting Commissioner, Central Office, New York State Department of Corrections and Community Supervision;~~ ROBERT MORTON, JR., ~~former Superintendent, Downstate Correctional Facility, New York State Department of Corrections and Community Supervision;~~ JOHN COLVIN, ~~Superintendent, Five Points Correctional Facility, New York State Department of Corrections and Community Supervision; DOMINIC A. D'AGOSTINO, Sheriff, Schenectady County Sheriff Department; TIMOTHY BRUCE, former Sergeant, Schenectady County Correctional Facility, Schenectady County Sheriff Department~~ each sued in their individual capacity,

                    Defendants.

~~(FIRST AMENDED COMPLAINT)~~

CIVIL RIGHTS COMPLAINT

Civil Action No. 9:21-CV-0681 (LEK/ML)

"Jury Trial Demanded"

(Second Amended Complaint)

<del>I. PRELIMINARY STATEMENT</del>

~~1.   Plaintiff, a pro se litigant, commenced this action initially, on June 7, 2021, while he was a pretrial detainee at the Schenectady County Correctional Facility (SCCF).~~

~~2.   Plaintiff in his initial Complaint inartfully attempted to assert claims for wrongful confinement and false imprisonment against employees of the New York State Department of Corrections and Community Supervision (DOCCS).~~

~~3.   Specifically, Plaintiff expressively asserted that he was falsely imprisoned past his conditional release date and wrongfully confined after he re-entered the custody of DOCCS for disciplinary actions stemming from a former commitment that was no longer valid due to his underlying conviction and sentence being overturned.~~

4.  The Court conducted a review pursuant to 28 U.S.C. Section 1915A and dismissed, without prejudice, the Complaint in its entirety for Plaintiff failing to state a claim upon which relief may be granted.

5.  All in all, it appears the Court's decision, with respect to both claims, somewhat rests on the idea that the original conviction and sentence in which was overturned, was not expunged. Plaintiff asserts unequivocally, for purposes of this amended complaint that his original conviction and sentence was, in fact, expunged.

6.  Of course, the Court was at no fault in drawing the inference that the overturned conviction, hence sentence, was not expunged, for it was Plaintiff who failed to clarify this fact in his original complaint.

7.  Unfortunately, Plaintiff was not afforded adequate access to necessary writing supplies, nor was he provided with any legal research materials when he prepared the complaint while he was a pretrial detainee at the SCGF.

8.  One of the main impediments responsible for Plaintiff not being able to prepare and perfect his complaint was due to him being on medical keeplock and classification hold due to COVID-19 when he was at the SCCF. The other issue was due to a campaign of retaliation and harassment waged against him while he was a pretrial detainee at the SCCF.

9.  The events underlying the SCCF's campaign of retaliation and harassment against Plaintiff are the subject of another action that will be pending screening shortly by the Court.

10.  Plaintiff respectfully request that the Court because of

~~potential problems that may arise with respect to issues concerning~~
~~res judicata and collateral estoppel, consider this action in tandem~~
~~with the other action that will be filed in a few weeks or, if~~
~~practical, that this action be held in abeyance until the other~~
~~action is resolved.~~
~~11. In any event, Plaintiff remains adamant in his position~~
~~regarding his placement in punitive segregation, whereas, it was~~
~~circumstances set forth below that Plaintiff was held past his~~
~~conditional release date.~~
~~12. With that said, the Court gracefully granted Plaintiff~~
~~leave to amend his complaint within 30 days from the filing date of~~
~~the decision and order. Plaintiff does so now.~~

## ~~II.~~ I. JURISDICTION

~~13.~~ 1.  This is a civil action seeking relief for damages and to defend and protect the rights guaranteed by the Constitution of the United States. The Court has jurisdiction over this action under 28 U.S.C. Section 1331 and 1343(3) and (4). The matters in controversy arise under 42 U.S.C. Section 1983.

## ~~III.~~ II. VENUE

~~14.~~ 2.  The United States District Court of the Northern District of New York is an appropriate venue under 28 U.S.C. Section 1391(b)(2) because it is where the events giving rise to these claims occurred.

## ~~IV.~~ III. PARTIES

### A. PLAINTIFF

~~15.~~ 3.  Plaintiff DAMIAN R. TRAPANI (Plaintiff), was, at all times mentioned a United States citizen and resident of the State of New York.

~~16.~~ 4.  At all times relevant when the event giving rise to these claims occurred, Plaintiff was under confinement in the custody of New York State Department of Corrections and Community Supervision (DOCCS).

B. DEFENDANTS

~~17. Defendant ANTHONY J. ANNUCCI, was, at all times mentioned herein, the Acting Commissioner for DOCCS.~~

~~18.~~ 5.  Defendant ROBERT MORTON, JR., was, at all times mentioned herein, the Superintendent for Downstate Correctional Facility (DCF).

~~19.~~ 6.  Defendant JOHN COLVIN, was, at all times mentioned herein, the Superintendent for Five Points Correctional Facility (FPCF).

~~20. Defendant DOMINIC A. D'AGOSTINO, was, at all times mentioned herein, the Sheriff for Schenectady County.~~

~~21. Defendant TIMOTHY BRUCE, was, at all times mentioned herein, a Sergeant for the Schenectady County Sheriff Department.~~

~~22. Upon information and belief, each defendant was, at all times mentioned herein, a United States citizen and resident of the State of New York. The source of Plaintiff's belief is based on his own observations and familiarity with the law.~~

~~23.~~ 7.  Each defendant is being sued in their individual capacity.

V. IV. FACTUAL ALLEGATIONS

~~24.~~ 8.  On July 22, 2016, Plaintiff was sentenced to a term of imprisonment of 2-4 years in state prison after he entered a plea to Attempted Burglary in the Third Degree, in open Court, at the Schenectady County Superior Court.

~~25.~~ 9.  On October 21, 2016, Plaintiff, pursuant to a commitment order, signed by, Superior Court Judge, Hon. Matthew J. Sypneiwski, was transferred by members of the Schenectady County Sheriff Department to the custody of DOCCS.

~~26.~~ 10. On June 7, 2018, the judgment entered by the Schenectady County Superior Court was reversed, on the law, and the indictment, underlying Plaintiff's 2016 sentence and conviction for Attempted Burglary, was dismissed, by the Supreme Court of the State of New York, Third Judicial Department, Appellate Division ("Appellate Division"). See People v. Trapani, 162 A.D. 3d 1121, 78 N.Y.S. 3d 745.

~~27.~~ 11. The Appellate Division granted leave to resubmit any appropriate charges to another Grand Jury to the People, whom, in this case, were represented by the office of the Schenectady County District Attorney ~~("People").~~ ~~Id.~~

~~28.~~ 12. Plaintiff was first informed, in writing, on ~~Sept~~ June 11, 2018, by his then assigned Appellate Counsel, Scott G. Walling, about the decision rendered by the Appellate Division, reversing the judgment rendered by theeSchenectady County Superior Court, on the law, and the indictment, underlying Plaintiff's 2016 sentence and conviction for Attempted Burglary, being dismissed.

~~29.~~ 13. Appellate Counsel, Scott G. Walling, also informed Plaintiff in writing that he, along with, Deputy Chief Assistant Public Defender, Laureen Mack, was in the process of arranging his release. At the time Plaintiff received news from his Appellate Counsel about the decision rendered by the Appellate Division he was confined in punitive segregation at the FPCF.

~~30.~~ 14. On June 12, 2018, Plaintiff was released from the custody od DOCCS and transported by members of the Schenectady County Sheriff

Department from the FPCF to the SGGF Schenectady County Correctional
Facility (SCCF).

31. 15. Immediately prior to members of the Schenectady County
Sheriff Department transporting Plaintiff from the FPCF to the SCCF
the following events occurred:

(a) Plaintiff was told to pack up his personal belongings by the
Floor Sergeant, Sergeant Casper, because he was being released.

(b) Plaintiff, due to the circumstances surrounding his hasty
departure, was made to elect to dispose of most of his personal
belongings, including but not limited to, numerous books on
comparative religion and esoterical thought, accumulated legal articles
and manuals, personal hygeine items and other personal effects.

(c) Plaintiff was given what was commonly referred to as, parole
clothes, which was state issued release clothes, consisting of what
sneakers, brown khaki pants, belt, white long-sleeved botton-down
dress shirt, coat, underwear, and a traditional pair of cotton socks
to wear.

(d) Plaintiff was given a receipt of the funds released from his
inmate account, along with a check for that stated amount.

(e) Plaintiff was given a property receipt and, what he thought
at the time to be, a Receipt of Discharge. However, it was discovered
later upon Plaintiff's inspection of his institutional files that
there was no evidence of a Receipt of Discharge.

32. 16. Upon information and belief, it was standard procedure
for staff at the FPCF to present an inmate being releaseddwith a
document in triplicate form (described in paragraph 19
Receip[t] of Discharge) to sign, and provide him or her with the pink
carbon copy therefrom, as well as, a Certificate of Discharge, and

a Voting Registration form. The source of Plaintiff's belief is based
on his personal observations of the process when he was released on
an occasion prior to the instant one in question.

33. 17. Curiousi lv, Plaintiff, upon being released from the
FPCF, was not presented with any document in triplicate form to sign,
Receipt of Discharge or otherwise, nor was he provided with a pink
carbon copy of any document in triplicate form. Neither was he
provided with a Voting Registration form, nor a Certificate of
Discharge.

34. 18. The events and actions undertaken by staff at the
FPCF, described in paragraph 19 6 above, tend to support the
conclusion that those responsible for seeing Plaintiff off knew he
was supposed to be released.

35. 19. Conversely, events and actions not undertaken by staff
at the FPCF described in paragraphs 14-15 above, tend to support the
conclusion that those responsible for seeing Plaintiff off knew he
was supposed to return, or there was a strong likelihood of him
returning.

36. 20. In any event, shortly after arriving at the SCCF,
Plaintiff, over his objection, was placed, without provocation, need,
or valid explanation, unnecessarily back in punitive segregation
there. Neither was Plaintiff unconscious of the restrictive nature of
the confinement, nor was did he consented to it.

37. 21. Defendant Timothy Bruce, the Sergeant who supervised
the admission of Plaintiff to punitive segregation, informed him
that he was being confined as such only because he was in punitive
segregation prior when he was at the FPCF.

38. 22. The next day, on June 13, 2018, Plaintiff was brought

to the County Courthouse Building for proceedings before the Superior Court, in and for the County of Schenectady.

39. 23. Prior to appearing for the proceedings <u>before the Superior Court on June 13, 2018</u>, Plaintiff was informed by Deputy Chief Assistant Public Defender, Lauren Mack, who was assigned to his case <u>represent him</u>, that the People elected to present the matter before another Grand Jury panel and that they were extending a plea deal of 1.5-3 years incarceration as a predicate felone instead of the 2-4 years he was initially sentenced to. Deputy Chief Assistant Public Defender, Lauren Mack, said she could arrange for Plaintiff to receive a definite sentence of 1 year <u>incarceration</u> in the County jail, but Plaintiff insisted that he would take the 1.5-3 year plea deal because he already had enough time in to qualify for conditional release.

40. 24. Also, Deputy Chief Assistant Public Defender, Lauren Mack, informed Plaintiff that he was supposed to be released earlier, but was not, because of a disagreement between DOCCS and the SCCF, concerning who would be responsible for transporting and housing him during the course of the prospective proceedings.

41. 25. Plaintiff interpreted the disagreement between the Schenectady County Sheriff Department and DOCCS, and described to him by Deputy Chief Assistant Public Defender, Lauren Mack, to be one regarding not to just who would be responsible for providing housing and transportation, but rather one regarding who would ultimately bear the cost associated with housing and transporting Plaintiff.

42. 26. In any event, after Plaintiff visited with his then assigned counsel, Deputy Chief Assistant Public Defender, Lauren Mack, he was brought before the Court, and the presiding Superior Court Judge  Hon. Matthew J. Sypneiwski, was the sentencing judge,

who presided over the original proceedings.

~~43.~~ 27. During the proceedings, Superior Court Judge, Matthew
J. Sypniewski, reiterated into the record, in pertinent part, the
decision handed up by the Appellate Division, after which he
~~arranged~~ arraigned Plaintiff on the Felony Information charging him
with Burglary in the Third Degree and Criminal Mischief in the Fourth
Degree.

~~44.~~ 28. Plaintiff pled guilty to a Superior Court Information
charging him with Attempted Burglary in the Third Degree in full
satisfaction of the entire docket and was sentenced to 1.5-3 years
incarceration in state prison.

~~45.~~ 29. Plaintiff was given credit for the time he already
served for the overturned 2016 Burglary conviction and sentence.

~~46.~~ 30. Plaintiff prior to the conclusion of the proceedings
held with respect to the overturned 2016 Burglary conviction and
sentence informed the Court that he already had enough time in to
qualify for conditional release, and prior to the matter being finalized
, asked the presiding judge if the sentence will be treated as a new
and separate commitment. The presiding judge said "it would' and
directed his Clerk to make a note of it on the sentencing and
commitment papers.

~~47.~~ 31. Later, after the Court proceedings, Plaintiff was told
by another detainee, by the name of Armando Henry, that he would be
placed back in punitive segregation and denied early release
pursuant to conditional release upon re-entering the custody of DOCCS.

~~48.~~ 32. Armando Henry stated that he was placed back in punitive
segregation upon returning to DOCCS after being released due to a
sentence and conviction being overturned.

49. 33. On June 14, 2018, members of the Schenectady County Sheriff Department transported Plaintiff, along with other detainees, from the SCCF to the DCF.

50. 34. At all times mentioned herein, the DCF was one of the Reception and Classification Centers designated by DOCCS.

51. 35. Upon information and belief, a new set of sentencing minutes and new commitment order was accompanying Plaintiff upon him being received by the DCF. The source of Plaintiff's belief is based on his familiarity with the procedures and law in place at the DCF, and his personal observations made later upon his inspection of documents contained in his institutional files.

52. 36. Despite the new sentencing minutes and commitment order that accompanied Plaintiff upon him being transported and received by the DCF, the staff there classified him as a routine court return pursuant to the 2016 commitment order that was no longer valid due to his conviction and sentence being overturned.

53. 37. While at the DCF, staff, over Plaintiff's objection, placed him, without provocation, need, or valid explanation, unnecessarily back in punitive segregation. Neither was Plaintiff unconscious of the restrictive nature of the confinement, nor was did he consented to it.

54. 38. One of the sergeants present, Sergeant Figueroa, disagreed with the decision made by the other staff to place Plaintiff back in punitive segregation for disciplinary sanctions imposed on him prior to him being released and committed again to the custody of DOCCS.

54. 39. According to Sgt. Sergeant Figueroa, as it was later revealed to Plaintiff, the matter regarding him being placed back in punitive segregation at the DCF was taken all the way up to the

Superintendent, who, at the time, was defendant Robert Morton, Jr., to
no avail. Also, it was revealed to Plaintiff by ~~Sgt.~~ Sergeant
Figueroa that it was essentially up to the Superintendent whether to
place an inmate, upon returning from a court-ordered discharge, back
in punitive segregation.

~~56.~~ 40. At no time was Plaintiff released within the 10-day time
period following his interview with parole staff. Instead, shortly
after the time period expired, Plaintiff was transferred back to the
FPCF and, over his objection, placed, without provocation, need, or
valid explanation, unnecessarily back in punitive segregation. Neither
was Plaintiff unconscious of the restrictive nature of the confinement,
nor ~~was the confinement~~ consented to it.

~~57.~~ 41. The same sergeant, Sergeant Casper, who supervised
Plaintiff's release, on June 12, 2018, supervised the escort of Plaintiff
back in punitive segregation at the FPCF.

~~58.~~ 42. At some point while in punitive segregation at the
FPCF a few of Plaintiff's books and hygeine items was returned to him,
but the bulk of his personal belongings that were in the cell he was
assigned to prior to him being released, on June 12, 2018, was not.

~~59.~~ 43. The conditions of confinement endured by Plaintiff
while in punitive segregation were disporportionately ~~differently~~
from the conditions of confinement experienced by him ~~while~~ when he
was inmate in the regular general population.

~~60.~~ 44. In punitive segregation, Plaintiff was not able to work,
take a vocational program or satisfy any recommended programming. In
general population, he was able to work, take vocational courses or
fulfill any obligation he had with respect to programming, all of
which would have provided him an earned prison income.

61. 45. As an inmate in punitive segregation, Plaintiff was allowed only three ten-minute showers a week. In general population, he was afforded a during outside recreation pretty much every day. Also, in general population, he would be afforded a shower inside three times a week and after the performance of an assigned job function.

62. 46. Although in general population, Plaintiff would hav unfettered access to his personal belongings, he was restricted in the kinds of possessions he could keep on him in his cell while in punitive segregation.

63. 47. In general population, plaintiff was permitted to move relatively freely within his assigned facility, sometimes without an escort. In contrast, as an inmate in punitive segregation, he was only permitted outside his cell when it was absolutely necessary, and on these rare occasions, he had to be handcuffed and shackled and shadowed by an escort.

64. 48. As for recreational activities, Plaintiff was letroutside his cell each day for fresh air at certain intervals through the back door of his cell into an adjacent rec-pen area, in which resembled that of a dog kennel. When Plaintiff was in general population, he was permitted to exercise in a separate yard, with a great deal of space to walk around in, and had access to sporting and exercise equipment, for up to four to six hours a day and had recreation indoors for days marked by poor ~~climatic~~ weather conditions.

65. 49. Moreover, Plaintiff during his time in punitive segregation was not permitted his medically prescribed boots and was unable to properly exercise at all. While in general population, he was accommodated with his medically prescribed boots.

66. 50. Shortly after arriving at the FPCF, Plaintiff received a Time Computation sheet (i.e., Legal Date Computation) from the facility staff, which was written notification establishing his parole board hearing date, conditional release date, and the maximum expiration date of his sentence.

67. 51. The date indicated in the Time Computation sheet when Plaintiff can be released under Community Supervision for parole or/and conditional release had sufficiently elapsed at the time he received receipt of the Time Commputation sheet was accurate, whereas, he was arrested for the offense he was convicted for exactly three years prior, excluding the day of he was arrested, which was on December 11, 2016.

68. 52. Additionally, shortly after arriving to at the FPCF, Plaintiff was made to go before the Time Allowance Committee (T.A.C.).

69. 53. The T.A.C. was the advisory body, consisting of three members designated by the Superintendent, responsible for making recommendations as to the amount of good behavior allowance to be granted to an inmate who would be considered for such allowance. Good behavior allowances can be used to obtain release under Community Supervision and ultimately shorten the amount of time to be served prior to parole consideration.

70. 54. Ordinarily, an inmate would not be required to appear before the T.A.C., unless following review of his or her file, the T.A.C. discovers a recommended loss of good behavior allowances imposed as a penalty at a hearing conducted due to one or more disciplinary infractions.

71. 55. The T.A.C. Plaintiff appeared before following his transfer back to the FPCF recommended that all good behavior allowances be withheld. The T.A.C. recommendation that all good

behavior allowances be withheld from Plaintiff was based on his poor
behavior and lack of progress and achievement in the ~~treatment~~ programs
he was assigned for the period he was incarcerated prior to his 2016
sentence and commitment being annulled and expunged.

/       ~~72.~~ 56. The T.A.C. recommendation notwithstanding it being
predicated on erroneous information was adopted and upheld by defendants
, ~~Superintendent,~~ John Colvin, and then Acting Commissioner, Anthony J.
Annucci.

~~73.~~ 57. Plaintiff attempted to informally and formally resolve
the issue of him being placed in punitive segregation and his 2016
commitment order being used instead of the 2018 commitment order, to no
avail. Subsequently, Plaintiff filed a Habeas Corpus petition in the
Seneca Supreme Court, which was later converted to a matter pursuant
to Article 78 of the Civil Practice Law and Rules of New York. The
petition incorporated numerous exhibits of documents he obtained from
DOCCS, including but not limited to, the 2018 commitment order and
sentencing minutes. Plaintiff was released from DOCCS during the
pendency of the matter before the Seneca Supreme Court.

~~74.~~ 58. Despite the loss of good behavior allowances, Plaintiff
was released on December 2, 2018, which was eight days before when he
should have been released due to him loosing all good behavior
allowances.

~~75.~~ 59. Defendants John Colvin and Robert Morton, Jr., implicitly
admitted wrongdoing by releasing Plaintiff early rather than holding
him until his maximum release date. Clearly, defendants were prompted
to release Plaintiff early as a result of the litigation brought by
him, which was pending at the time in the local Supreme Court.

~~76.~~ 60. In any event, because of defendants John Colvin and

Robert Morton, Jr.'s actions, Plaintiff remained incarcerated and ~~in~~ wrongfully confined un r punitive segregation, continuously, without interruption, from June 12, 2018 to December 2, 2018, totalling 171 days. Also, Plaintiff was already incarcerated and un r punitive segregation for a six month period,for disciplinary action taken against him following disciplinary hearings being as early as August 9, 2017, prior to him being made to remain in punitive segregation after being released and committed again to DOCCS' custody, time of which should be considered notwithstanding 3 ear statute of limitation bar due to Executive rders issued by former New York State Governor, Andrew M. Cuomo, tolling state statute of limitation periods during the COVID-19 coronavirus pandemic.

### ~~VI.~~ V. LEGAL CLAIMS

~~77.~~ 61. At the time of the events complained of herein, defendants , ~~Acting Commissioner, Anthony J. Annucci, Superintendents,~~ John Colvin and Robert Morton, Jr., acting independently, or together with numerous other officials, including but not limited to, Sheriff, Dominic A. D'Agostino, and Sergeant Timothy Bruce, have created, authorized, maintained, permitted, and enforced a policy or procedure of not releasing on paper state prison inmates in punitive segregation, who~~,~~ they knew, or should have known, had their sentences terminated due to their underlying criminal convictions and sentences being annulled and expunged for purposes of placing them back in punitive segregation if they return, and withholding good behavior allowances.

~~78.~~ 62. The policy or procedure promoted by defendants, set forth in further detail above, targeted inmates who owed time in punitive segregation for disciplinary sanctions imposed on them, and

loss of good behavior allowances, prior to their sentences and convictions being expunged, whereas, upon information and belief, those in general population, who received similar dispositions, were not treated in the same manner. The source of Plaintiff's belief is based on his personal observations and conversations he had with officials and peers.

~~79.~~ 63. In was the policy, procedure, and/or practice of at least certain facilities controlled and maintained by DOCCS to not completely release inmates, who, they knew,or should have known, had their underlying sentences and convictions annulled and expunged. In addition, at certain facilities there existed a policy, procedure, and/or practice of placing inmates, over their objection, unnecessarily back in punitive segregation, and withholding good behavior allowances, for disciplinary sanctions that were imposed on them prior to their sentences being terminated and their underlying criminal convictions being annulled and expunged.

~~80.~~ 64. The acts and practices described in paragraphs ~~30-79~~ 14-63, were made with the approval, authorization, knowledge, ratification, and consent of defendants, ~~Acting Commissioner, Anthony J. Annucci, Superintendents~~ John Colvin and Robert Morton, Jr., as well as, numerous other officials, including but not limited to, Sheriff , Dominic A. D'Agostino. Plaintiff specifically alleges that these defendants had been made aware of the policy, procedure, practices and/or acts alleged by virtue of complaints filed with certain of the defendants and filed in Court. Nontheless, defendants named in this paragraph continued to enforce and to give the appearance of approving of all the policies, procedures, and practices alleged above.

~~81.~~ 65. All defendants named in the action acted jointly and in

consert and conspiracy of placing Plaintiff, over his objection,
unnecessarily back in punitive segregation, and to withholding good
behavior allowances from him.

~~82.~~ 66. ~~Defendants,~~ Acting Commissioner, Anthony J. Annucci,
and Sheriff, Dominic A. D'Agostino, and perhaps others, upon information
and belief, acting jointly and in concert and conspiracy with one
another, permitted the misappropriation of public funds, in
furtherance of a plan or scheme to place Plaintiff back in punitive
segregation and to withhold good behavior allowances from him. The
source of Plaintiff's belief is based on the disagreement defendants
John Colvin, and others had with the Schenectady County Sheriff
Department ~~as about to~~ who would be responsible for providing the
housing and transportation of Plaintiff following his case being
overturned as described in paragraph ~~40~~ 24 above, as well as, other
personal observations made prior to, during, and after his release on
June 12, 2018.

~~83.~~ 67. Each of the defendants, ~~Acting Commissioner, Anthony J.
Annucci and Sheriff, Dominic A. D'Agostino~~ John Colvin and Robert
Morton, Jr., had a duty to command, regulate, and control the actions
of officers and employees under their supervision so as to prevent
those subordinate officials from acting in a manner that deprives
individuals in their custody of their rights under the Constitution
and laws of the United States, but has failed to do so in the following
respects:

(a) Each has failed to exercise adequate supervision over
subordinates and failed to take steps to regulate and control the
discretion of subordinate officials so as to prevent the conduct
alleged in paragraphs ~~30-80~~ 14-64 above, which were known to exist.

(h) Each had failed to provide or enforce lawful and proper guidelines and procedures to assist subordinates to engage in only lawful acts.

~~84.~~ 68. Alternatively, defendants, ~~Acting Commissioner, Anthony J. Annucci, Superintendent,~~ John Colvin and Robert Morton, Jr., acting independently, or ~~together~~ togather with, numerous other officials, including but not limited to, Sheriff, Dominic A. D'Agostino, absent a policy, procedure or practice, arbitrarily and irrationally singled Plaintiff out, as opposed to others similarly situated, by placing him in punitive segregation, and withholding his good behavior allowances, for one or more disciplinary sanctions imposed on him during a commitment that, they knew, or should have known, was no longer valid due to his sentence and underlying criminal conviction being annulled and expunged.

~~85.~~ 69. The policies, procedures, practices or/and acts of defendants ~~alleged in paragraphs 17-21 above~~ John Colvin and Robert Morton, Jr., violated the rights of Plaintiff under the ~~First, Fourth, Eigth, and~~ Fourteenth Amendments to the Constitution of the United States and, therefore, violate Title 42 U.S.C. Section 1983 as follows:

(a) ~~Releasing Plaintiff from prison, but not properly recording or certifying such, following his case being annulled and expunged, in furtherance of a plan or scheme to place him back in punitive segregation and to withhold good behavior allowances, constituted cruel and unusual punishment in violation of the rights, privileges and immunities under the Eigth Amendment.~~

~~(b) Releasing Plaintiff from prison, but not properly recording or certifying such, following his case being annulled and expunged, in~~

~~furtherance-of-a-plan~~ or scheme to place him back in punitive segregation
~~, and-to-withhold good behavior allowances, upon his anticipated return~~
~~, thus, causing him-to dispose of property, even though he was not~~
~~technically released, without returning said property, upon him actually-~~
~~returning, deprived him-of his right to be free from unreasonable~~
~~searches and-seizures, in violation of the rights, privileges-and~~
~~immunities under the Fourth-Amendment.~~

~~(e) Releasing Plaintiff from prison, but not properly recording~~
~~or certifying such, following his case being annulled and expunged, in~~
~~furtherance of a plan or scheme to place him, over-his objection, back~~
~~in punitive segregation,-and to withhold good behavior-allowances,~~
~~upon his anticipated-return, and upon him actually returning, doing~~
~~so, constituted retaliatory punishment, in violation of the-rights,~~
~~privileges and immunities under the-First Amendment.~~

~~(d)~~ Releasing Plaintiff from prison, but not properly recording
or certifying such, following his case being annulled and expunged,
in furtherance of a plan or scheme to place him back in punitve seg
segregation, and to withhold good behavior allowances, upon his
anticipated return, and upon him actually returning, placing him,
over his objection, back in punitive segregation, and withholding his
good behavior allowances, based on disciplinary determinations
rendered during a commitment, <u>that they knew, or should have</u> known,
~~to have~~ expired, without more, deprived him of due process in
violation of the rights, privileges and immunities unedr the
Fourteenth Amendment.

~~86.~~ <u>70.</u> Defendants, ~~Acting Commissioner, Anthony J. Annucci,~~
~~Superintendents,~~ John Colvin and Robert Morton, Jr., acting independently
, or ~~together~~ together with  numerous other officials, including but

not limited to, Sheriff, Dominic A. D'Agostino, and Sergeant, Timothy
Bruce, have created, authorized, maintained, permitted, and enforced
a policy or procedure of not releasing on paper state prison inmates
in punitive segregation, who, they knew, or should have known, had
their sentences terminated due to their underlying criminal convictions
being annulled and expunged, for purposes of placing them back in
punitive segregation, if they return, and withholding good behavior
allowances.

~~87.~~ 71. ~~Defendants~~ Dominic A. D'Agostino, Timothy Bruce, and
perhaps others, conspired with and aided and abetted ~~the~~ defendants
~~described in paragraphs 17-19 above~~ John Colvin and Robert Morton, Jr.
to violate the rights, privileges, and immunities of Plaintiff by
providing substantial assistance to ~~the other~~ defendants in carrying
out the policies, procedures, and practices of subjecting Plaintiff to
punitive segregation, and denying the provision of good behavior
allowances, for disciplinary sanctions imposed against him during a
commitment, they knew, or should have known, expired, ~~over his objection~~
~~, and without just cause~~ following his case being annulled and expunged,
all with the knowledge that such would occur in violation of his
constitutional rights ~~alleged in paragraphs 30-86 above~~.

~~88.~~ 72. The policies, procedures, practices and/or acts alleged
in paragraphs ~~30-8~~ ~~and 87~~ 14-71 above were undertaken, aided,
authorized, supervised or consented to by each defendant with malice,
with wanton desire and design to violate, and with deliberate
indifference ~~to~~ and reckless disregard of the rights, privileges, and
immunities of Plaintiff under the ~~First, Fourth, Eighth and~~ Fourteenth
Amendment to the Constitution of the United States ~~as set forth in~~
~~paragraph 86 above~~.

~~89.~~ 73. As a result of the policies, procedures, practices, and/or acts of defendants, <u>John Colvin and Robert Morton, Jr.,</u> Plaintiff ~~have~~ has suffered severe emotional and psychological distress, anguish, anxiety, ~~and~~ injury, and pain and suffering due to the willful, wanton, ~~and~~ deliberate indifference and misconduct of the defendants<u>, JohnColvin and Robert Morton, Jr.</u>

### ~~VII.~~ VI. PRAYER FOR RELIEF

~~90.~~ 74. Plaintiff prays for judgment in the sum of ~~$100,000.00~~ $27,000.00, as ~~compensatory~~ <u>nominal</u> damages, and the sum of ~~$50,000.00~~ $108,000.00, as punitive damages, ~~and the sum of $1.00, as nominal damages,~~ against each defendant named herein, jointly and severely.

~~91.~~ 75. Granting any other and further relief this Court deems just and equitable and proper.

### VII. CERTIFICATION AND CLOSING

\_    Under federal Rules of Civil Procedure<u>, Rule 11,</u> by signing below, I certify to the best of my knowledge, information, and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support after a reasonably opportunity for further investigation or discovery; <u>and</u> (4) the Complaint otherwise complies with the requirement of Rule 11.

Dated: Wallkill, New York
      May 19, 2024                          Respectfully submitted,

                                       _____
                                       Damian R. Trapani